IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

    Plaintiff,                         No. S-Mag 06-0021 GGH

    vs.                               CR-S-06-0035 MCE

LAUREN WEINER,

    Defendant.                   <u>ORDER</u>

_____/

*Introduction and Summary*

        Defendants in this action, Eric Mc David, Zachary Jenson, and Lauren Weiner have been charged by complaint with conspiracy (18 U.S.C. § 844(n)) to violate 18 U.S.C. § 844(f)(1) (destruction by explosion or fire of United States real property) and § 844(i) (destruction of a building etc. by explosion or fire when said property was used in interstate commerce).  On January 25, 2006, an indictment was returned against these defendants alleging the same charge with the exception that subsection (f) generally was described in the indictment. The background to the alleged conduct is defendants' actions in concert with, or in sympathy with, the aims of the Earth Liberation Front (ELF), a movement dedicated to destroying property (and at times, people) associated with activities at odds with the ELF's ideas of what is good for the environment.

1

All defendants have sought release on bail and conditions. The United States strenuously urges that all defendants be detained as flight risks and dangers to the community if released. The court finds in this order that defendant Lauren Weiner may be released on conditions.

*Facts Common to All Defendants*

The great weight of evidence thus far, as set forth in the Complaint affidavit and as produced at defendant Weiner's detention hearing, clearly indicates that all three defendants engaged in the aforementioned conspiracy to attempt destruction of one or more proposed targets in the greater Sacramento metropolitan area and/or El Dorado County. According to the complaint, the three defendants and an undercover, paid FBI source rendezvoused in a residence in Dutch Flat located in Placer County. Unbeknownst to the defendants, the house obtained by the informant and the informant were wired to record their conversations. These conversations included debates on the "best" target, a statement from defendant McDavid that "human casualties would be acceptable," discussions on how to create explosive devices, and how defendants planned to go underground after completion of their criminal deeds. Defendants also engaged in preparatory activities (along with the sometimes facilitation by the informant) with the view of accomplishing their destructive aims such as reconnaissance of at least two potential targets, acquisition of bomb making "recipes," and purchase of materials with which to make explosive devices. All three defendants actually initiated a cooking of bleach in order to commence bomb making activities.

While this group of defendants may not have possessed a polished expertise in explosives and their use in blowing up targets, there is no doubt from the evidence presented thus far that defendants were deadly serious in their intent to wreak destruction on some type of target which they believed would make a statement in favor of their anti-government, anti-corporate, allegedly pro-environment cause. It is also apparent, that regardless of expertise, defendants, if not stopped, would have set off some type of explosive device with the risk to human life

possible, but which risk is quantitatively unascertainable at this point.

The government also spent some time at Weiner's detention hearing attempting to link defendants to primarily the ELF, and also the ALF (Animal Liberation Front). These organizations were characterized by the government's expert as leaderless, for the most part structureless, "movements" comprised of individual, autonomous cells. The cells kept in loose contact with each other via websites, and gatherings at protest sites. These cells shared some common goals, e.g., throwing off government control, anti-corporate philosophy, "protecting" the environment and non-human organisms/creatures within the environment, but the overall organization apparently has no constitution, bylaws or rigid, binding dogma. Members of cell groups may support members of other groups out of supposed common purpose. However, other than one statement by McDavid that the group's criminal actions should be attributed to the ELF, no evidence directly linking defendants to this movement was produced. Nevertheless, the aims of these defendants relate in a general fashion to the testified about aims of the ELF.

The government did produce evidence that defendants were visited in jail by members of some type of support group perhaps affiliated (in a very loose way) with the ELF movement. Evidence of criminal intent by this group in terms of aiding some type of absconding if released was not thus far produced, but it is curious that members of what will be termed a "support group" were instantly aware of defendants' incarceration, and nearly instantaneously visiting defendants.

*Facts Regarding Defendant Weiner*

Defendant Lauren Weiner, born in New York, of presently fairly well-to-do parents, was attending college in Philadelphia just prior to her trip to California. As seen from her *MySpace.com* "fireflie" and ren!agade" webpages, Weiner was beginning to take on the trappings of what the government expert might describe as a typical ELF protestor – rootless,

\\\\\

\\\\\

traveling while living off the land, and off on "advenchures," aka "advenchers."[1]  In a thinly disguised report of her anticipated activities while on her trip to the West Coast, she reported:

> ok, so im out-heading to the other side for awhile-traveling and taking every experince I can-I am strong, loved and motivated to do well.  im my way twards quitting bad habits and bringing out the better parts of myself and others.  my advenchure starts now- I will try to get to a net sometimes- but chances are I wount be able to keep up...tons of stories and a million advenchers are to come- expect me on your couch anyday now...

Posting of January 4, 2006

> after a pit stop in denver, crashed at my cuzins place- hit up an REI, then out-followed freights all the way up I-80.  never seen so much space till I got to navada, got crazy colostrophobic in wyoming.  danced with pirates when we made it to cali.[2]

Posting of January 9, 2006.

In a posting to the "fireflie" webpage, Weiner described her interests – a mixture of ordinary things and things vagabond/protestor:

> your mum, sewing... riot folk...dumpstering HUNDREDS OF $ OF FREE FOOD!!  mutuail aid, bad spelling...destroying the american lie...fireflies, cuddling with lots of people, riots, singing load and strong, riding trains, being dirty, punk rock battle skirts....

She also indicated her friendship with co-defendant Jenson by reference to his website name: "Ollie Aucksen."  Her favorite book was one by a reputed anarchist – Derek Jensen.

The government presented substantial evidence that once Weiner joined her cohorts in California, she participated, both in discussion and actions, in the group's eco-terror plans.  While Weiner was not the leader of her co-defendant group, the evidence showed that she actively suggested targets, planning operations and the like.  Weiner certainly "talked the talk" of

---

[1] As Ms. Weiner describes in her "interests" portion of her website, "bad spelling" is part of her interests.  The bad spelling is purposeful and seemingly intended to prove her disdain for conventional rules.

[2] "Pirate" is a pseudoname associated with defendant McDavid.

4

a radical anarchist[3] making statements that she would like to assist in overthrowing the government, as well as her desire to engage in "direct action," a code word for potential criminal activities. She also recommended to her cohorts certain books, *The Poor Man's James Bond* for the purpose of instruction on explosive making. While the defense brought out some points of FBI informant facilitation of the offenses described in the complaint, defendant Weiner seemingly did not need much enticement in terms of her participation in the conspiracy.

The government demonstrated that Weiner suggested targets for her eco-terrorist-group even to the point where her suggestions were motivated by destruction which "would have the most affect" on other persons. Weiner was seen as actively participating in the attempted brewing of the first unsuccessful batch of chemical explosive material.

The defense, primarily through the pretrial service report, presented evidence to suggest that conditions existed to adequately protect the community and deter flight if Weiner were to be released. Secured bond in an amount in excess of $1,000,000 could be posted. The defense was willing to have this bond apply to any condition of release, and Weiner's parents agreed to this in questioning in open court. The defense proffered that Weiner had close ties to her parents, and the evidence suggested that she had only recently determined to separate herself from her previous home contacts in the accomplishment of her eco-mission.

Weiner has no criminal record, although the government produced some evidence that Weiner had engaged in minor vandalism. She has used marijuana previously but does not appear to have used more personally destructive substances.

*Analysis*

Release on conditions is the general rule, and not the exception:

> The Bail Reform Act of 1984, 18 U.S.C. §§ 3141, et seq., requires the release of a person facing trial under the least restrictive

---

[3] "anarchism...the theory that all forms of government interfere unjustly with individual liberty and should be replaced by the voluntary association of cooperative groups." *Webster's New World Dictionary*, Third College Edition.

a radical anarchist[3] making statements that she would like to assist in overthrowing the government, as well as her desire to engage in "direct action," a code word for potential criminal activities. She also recommended to her cohorts certain books, *The Poor Man's James Bond* for the purpose of instruction on explosive making. While the defense brought out some points of FBI informant facilitation of the offenses described in the complaint, defendant Weiner seemingly did not need much enticement in terms of her participation in the conspiracy.

The government demonstrated that Weiner suggested targets for her eco-terrorist-group even to the point where her suggestions were motivated by destruction which "would have the most affect" on other persons. Weiner was seen as actively participating in the attempted brewing of the first unsuccessful batch of chemical explosive material.

The defense, primarily through the pretrial service report, presented evidence to suggest that conditions existed to adequately protect the community and deter flight if Weiner were to be released. Secured bond in an amount in excess of $1,000,000 could be posted. The defense was willing to have this bond apply to any condition of release, and Weiner's parents agreed to this in questioning in open court. The defense proffered that Weiner had close ties to her parents, and the evidence suggested that she had only recently determined to separate herself from her previous home contacts in the accomplishment of her eco-mission.

Weiner has no criminal record, although the government produced some evidence that Weiner had engaged in minor vandalism. She has used marijuana previously but does not appear to have used more personally destructive substances.

*Analysis*

Release on conditions is the general rule, and not the exception:

> The Bail Reform Act of 1984, 18 U.S.C. §§ 3141, et seq., requires the release of a person facing trial under the least restrictive

---

[3] "anarchism...the theory that all forms of government interfere unjustly with individual liberty and should be replaced by the voluntary association of cooperative groups." *Webster's New World Dictionary*, Third College Edition.

> condition or combination of conditions that will reasonably assure the appearance of the person as required and the safety of the community. 18 U.S.C. § 3142(c)(2); United States v. Motamedi, 767 F.2d 1403, 1405 (9th Cir.1985). Only in rare circumstances should release be denied, and doubts regarding the propriety of release should be resolved in the defendant's favor. Motamedi, 767 F.2d at 1405. On a motion for pretrial detention, the government bears the burden of showing by a preponderance of the evidence that the defendant poses a flight risk, and by clear and convincing evidence that the defendant poses a danger to the community. Id. at 1406-07.

U.S. v. Gebro, 948 F.2d 1118, 1121 (9th Cir. 1991).

However, within that general rule, Congress has set forth certain crimes for which the accused is presumed to be a flight risk and danger to the community, and hence ineligible for bail in the absence of countervailing evidence. All agreed that the charged offense set forth above is a presumptive offense for detention purposes. See 18 U.S.C. 3142 (e) referring to an offense listed in 2332b(g)(5)(B) of Title 18 which in turn references 18 U.S.C. 844(i), one of the object offenses of the conspiracy (§ 844n).[4] As a presumptive offense, in the absence of rebuttal evidence, the court shall presume "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community." § 3142(e). The presumption is, of course, subject to rebuttal by the defendant, but the presumption remains as an evidentiary factor dependent upon all the facts and circumstances of a particular case and defendant. United States v. Jessup, 757 F.2d 378, 380-382 (1st Cir. 1985) (Breyer, J.)[5] The burden of proof remains with the government by clear and convincing evidence (danger to the

---

[4] Although 18 U.S.C. § 844(n) is not itself listed within § 2332b(g)(5)(B), the terms of that section, which impose the same penalties as those specific sections which are the aim of the conspiracy, are sufficient to treat a conspiracy to commit a presumptive detention offense as one of the listed offense itself. Any other interpretation would lead to the absurd result that simply because one was caught prior to the actual commission of a planned offense, that person would not be considered as dangerous as the person who by luck or lack of informant participation was able to complete the offense prior to his arrest. Such illogic is not compelled by a reading of the aforementioned statutes.

[5] Dicta in Jessup on an entirely different issue (standard of review) was abrogated in United States v. O'Brien, 895 F.2d 810 (1st Cir. 1990).

6

community) and a preponderance (flight risk).  Id.  The specific factors set forth by Congress in § 3142(g) to be considered in addition to any presumption (which may be positive or negative for detention purposes) include the nature and circumstances of the offense, especially its violent aspects, the weight of the evidence (related by the Ninth Circuit to be the least important factor, see United States v. Windsor, 785 F.2d 755, 757(9th Cir. 1986)), details related to the person including: past conduct, criminal history, drug usage, ties to the community, whether the person was in court proceedings or on court imposed supervision when the crime was committed, and the nature and seriousness of the danger *to any person or the community that would be posed by the person's release*. (Emphasis added).   The bail statute does not require a guarantee of safety to the community – only that conditions of release can "reasonably assure" the safety of the community or any person within it.  § 3142(e), (g).  Detention for alleged terroristic crimes is not *de jure* or *de facto* automatic, and courts must analyze each defendant's background and circumstances independently.  See United States v. Al Arian, 280 F. Supp. 2d 1345 (M.D. Fla. 2003) (determining that some defendants, allegedly belonging to the Palestinian Islamic Jihad, and in a case whose perspective encompassed multiple human killings, could be released).

   While bail may not simply be set in a pre-determined amount which the court understands that a defendant cannot meet, § 3142(c)(2), the absence of substantial resources necessary to provide a deterrent effect may be considered in the bail equation, and may be significant in determining pretrial detention if a financial condition is a necessary component of reasonable assurance of non-flight and safety.  United States v. Fidler, 419 F.3d 1026, 1028 (9th Cir. 2005).[6]

---

[6] Fidler explained: "If the district court orders that the defendant be released subject to conditions, the statute specifically prohibits the court from 'impos[ing] a financial condition that results in the pretrial detention of the [defendant].' 18 U.S.C. § 3142(c)(2).  This provision was intended to prevent the practice of "de facto preventative detention," where a judge could in effect issue a detention order without a proper finding of risk of flight or danger to the community by granting bail but setting an exorbitant financial condition that the defendant could not meet. United States v. Westbrook, 780 F.2d 1185, 1187 n. 3 (5th Cir.1986).  Several other

Finally, the Ninth, First, Second, Fifth, Seventh and Tenth Circuits have expressly approved a bond whose security for compliance with conditions may attach to *any* condition of pretrial release. That is, the security for appearance may be forfeited upon any material breach of any condition of pretrial release. See United States v. Gigante, 85 F.3d 83, 85(2nd Cir. 1996) citing, among other cases United States v. Vaccaro, 51 F.3d 189, 191-92 (9th Cir. 1995).

Turning to an application of the facts in this case to the law, the undersigned has determined that bail is appropriate in this close case.

First, the court applies the presumption that Congress has required – that Weiner would be a danger to the community if released, and also a flight risk. The government adds weight to that presumption by introducing evidence that Weiner was an active, not passive, participant in the alleged conspiracy. Thus, the nature of the alleged crime weighs against any type of release.

The government adds to its side of the ledger with consideration of the weight of the evidence. Audio recordings of the defendant herself fully support the indictment/complaint allegations in this case, and essentially establish the case. The court is not impressed at this juncture with hints that the defense may attempt an entrapment defense, as such would seem

---

circuits have addressed the apparent violation of § 3142(c)(2) that arises when, as in Fidler's case, a defendant is granted pretrial bail, but is unable to comply with a financial condition, resulting in his detention. It may appear that detention in such circumstances always contravenes the statute. We agree, however, with our sister circuits that have concluded that this is not so. See Westbrook, 780 F.2d at 1188-89; United States v. McConnell, 842 F.2d 105, 108-09 (5th Cir.1988); United States v. Szott, 768 F.2d 159, 160 (7th Cir.1985) (per curiam); United States v. Wong-Alvarez, 779 F.2d 583, 585 (11th Cir.1985) (per curiam); United States v. Jessup, 757 F.2d 378, 388-89 (1st Cir.1985), abrogated on other grounds by United States v. OBrien, 895 F.2d 810 (1st Cir.1990). These cases establish that the de facto detention of a defendant under these circumstances does not violate § 3142(c)(2) if the record shows that the detention is not based solely on the defendant's inability to meet the financial condition, but rather on the district court's determination that the amount of the bond is necessary to reasonably assure the defendant's attendance at trial or the safety of the community. This is because, under those circumstances, the defendant's detention is 'not because he cannot raise the money, but because without the money, the risk of flight [or danger to others] is too great.' Jessup, 757 F.2d at 389."

8

doubtful given the nature of the law of entrapment.[7]

The history and characteristics of the person are multifaceted criteria, and on balance are mixed. Although the government has produced solid evidence that Weiner intended to commit a very serious crime, and that she had planned to go underground afterwards, living a nomadic lifestyle, she is not far removed from her parental and community contacts which seem strong with respect to her mother. Weiner has no criminal record, and is fairly young at this point. She has not previously engaged in significant, violent activities. The lack of a criminal record is an important factor which all courts generally use to predict future dangerousness. Moreover, the government has not supplied proof, as requested by the court, that Weiner made, or expressly accepted, callous statements regarding "acceptance of human casualties" that have been attributed to co-defendant McDavid. The overarching question to be answered, but which requires speculation, is how much Weiner's somewhat anarchist, at least anti-establishment, philosophy has been ingrained in her psyche. That is, do the seriousness of the instant proceedings provide enough of a shock value such that she realizes the seriousness of the charges and can be counted on to live up to her obligations to appear and abide by conditions of release.

\\\\\

---

[7] "When entrapment is properly raised, the trier of fact must answer two related questions: First, did government agents induce the defendant to commit the crime? And, second, was the defendant predisposed? We discuss inducement at greater length below, see page 698 infra, but at bottom the government induces a crime when it creates a special incentive for the defendant to commit the crime. This incentive can consist of anything that materially alters the balance of risks and rewards bearing on defendant's decision whether to commit the offense, so as to increase the likelihood that he will engage in the particular criminal conduct. Even if the government induces the crime, however, defendant can still be convicted if the trier of fact determines that he was predisposed to commit the offense. Predisposition, which we also discuss at length below, see page 703 infra, is the defendant's willingness to commit the offense prior to being contacted by government agents, coupled with the wherewithal to do so. See United States v. Hollingsworth, 27 F.3d 1196, 1200 (7th Cir.1994) (en banc). While our cases treat inducement and predisposition as separate inquiries, see, e.g., United States v. McClelland, 72 F.3d 717, 722 (9th Cir.1995), the two are obviously related: If a defendant is predisposed to commit the offense, he will require little or no inducement to do so; conversely, if the government must work hard to induce a defendant to commit the offense, it is far less likely that he was predisposed. See Hollingsworth, 27 F.3d at 1200."
U.S. v. Poehlman, 217 F.3d 692, 697, 698 (9th Cir. 2000)

At this point, the court would find that the government has met its burden both with respect to flight risk and danger to the community by the appropriate standards of proof. However, the bond to be posted, which will secure not only appearance, but also the remaining conditions of release, provide sufficient deterrence such that the balance tips over to Weiner's side. All evidence up to this point demonstrates that the million dollar plus bond which the court will impose will supply enough of a hurt or sting, if Weiner were to dishonor her conditions or release, that Weiner will be strongly motivated not to permit such hurt to befall her parents.[8] While the proffered security is no guarantee that conditions of release will be honored, the law does not require a guarantee. Moreover, the remaining conditions of release to be imposed, <u>see below</u>, will assist in protecting the community and assist in deterring flight.

Finally, Pretrial Services of this district has recommended release, and this opinion is entitled to be weighed in Weiner's favor.

*Conclusion and Conditions*

Accordingly, defendant Weiner will be released on the following terms and conditions:

1. A bond will be posted in the amount of $1,200,000. The bond will be secured in part by the real property owned by her parents[9], but at least $200,000 of this bond must be in the form of a corporate surety bond;

2. The above bond will apply to all conditions of release; the material violation of any condition may cause the forfeiture of the bond; Ms. Weiner's parents, although questioned under oath in court concerning their understanding of the nature of a <u>Vaccaro</u> bond, shall also supply a declaration which reiterates that they understand that their posted property and the

---

[8] The court gave the government an opportunity to question the parents regarding this security, but no questions were posed. However, the conditions of release posted below will give the government an opportunity to question the bona fides of the property to be posted.

[9] One of the properties must be her mother's unencumbered residence.

corporate surety bond may be forfeited for any material breach of any condition of release. Defendant Weiner shall also sign a similar declaration.

       3.  Ms. Weiner shall reside with her mother, Elizabeth Weiner, at 15 Hemlock Hill, Pound Ridge, New York, and in her third party custody; defendant Weiner shall not change her residence without the approval of the court.

       4.  Ms. Weiner shall either attend school for a minimum of 15 hours a week, or she shall seek and maintain community service volunteer work for the betterment of her community of at least 20 hours a week; however, this community service volunteer work may not involve any person or group engaged in environmental matters;

       5.  Ms. Weiner shall not have contact with her co-defendants, except through her counsel, and Ms. Weiner shall not have contact with any person, group, association or entity engaged in environmental issues or advocacy[10];

       6.  Ms. Weiner shall not possess a firearm, destructive device or other dangerous weapon; additionally, she shall provide written proof of divestment of any firearms under her control;

       7.  Ms. Weiner's travel is restricted to the State of New York; however, she may travel to and from the Eastern District of California for appearances;

       8.  Ms. Weiner shall refrain from any use of alcohol, or any use of a controlled substance without a prescription by a licensed medical practitioner, and Ms. Weiner shall notify Pretrial Service immediately of any prescribed medications.  However, medicinal marijuana, prescribed or not, may not be used; and Ms. Weiner shall submit herself to drug or alcohol testing as approved by the pretrial services officer;

\\\\\

---

[10] "Contact" includes not only Weiner initiated contacts, but also includes maintaining a contact initiated by a member of the proscribed group.  "Contact" shall be viewed in its broadest form, including in person, mail, telephonic, electronic or other means of communication.

9.  Ms. Weiner shall surrender any passport to which she has actual or constructive possession to the Clerk, U.S. District Court, and she shall not obtain any government paper which might permit international travel.

Defendant Weiner shall personally appear in court to state her understanding of the terms and conditions of release.

The government may submit any objections it has to the bona fides of the real property to be submitted no later than three calendar days after being supplied with the appropriate paperwork, i.e., trust deeds, or New York equivalents, appraisals, title reports, surety bonds, declarations and the like.  The government, having had the opportunity to question the parents, may not raise objections concerning lack of knowledge about the parents themselves.

**No release order will be signed until the undersigned has reviewed, and if necessary, held a hearing on the government's objections.**

**Regardless of any appeal filed by the United States, the undersigned will not stay the requirement that the United States timely file objections as set forth above.  The undersigned will not stay any hearing on the objections.**

**If the government does not object to the property posted, yet desires to maintain an appeal, the undersigned will stay the release of Lauren Weiner upon request pending appeal.**

DATED: 1/26/06

/s/ Gregory G. Hollows
_____
GREGORY G. HOLLOWS
UNITED STATES MAGISTRATE JUDGE

GGH:gh:035
weiner35.ord

12